# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| *In re:* Application Pursuant to 28 U.S.C.§ 1782 of<br><br>FARHAD AZIMA<br>5921 Ward Parkway<br>Kansas City, Missouri 64113<br><br>Petitioner,<br><br>v.<br><br>INSIGHT ANALYSIS AND RESEARCH LLC<br>13727 SW 152 Street #715<br>Miami, Florida 33177<br><br>Respondent,<br><br>SDC-GADOT LLC<br>3200 Collins Ave.<br>Suite L2<br>Miami Beach, Florida 33140<br><br>Respondent. | No. 22 mc- |

## DECLARATION OF DOMINIC HOLDEN

**I, DOMINIC HOLDEN**, do hereby declare under penalty of perjury pursuant to 28 U.S.C.§1746 the following.

**Introduction**

1.  I am admitted to practice law, as a solicitor, before the Courts of England and Wales and I am a partner of the London-based law firm located in London, United Kingdom (**"UK"**), Burlingtons Legal LLP (**"Burlingtons"**). Burlingtons acts for Mr. Farhad Azima, the Defendant and Counterclaimant in civil proceedings pending in the High Court of Justice

  of England and Wales, Business and Property List captioned: Mr Farhad Azima -v- RAKIA & Ors (Claim no.: HC-2016-002798) (**"the UK Proceedings"**).

2. I respectfully submit this Declaration in support of Mr. Azima's application for an order under 28 U.S.C. § 1782 directing that Insight Analysis and Research LLC (**"Insight"**) and SDC-Gadot LLC (**"Gadot"**) (collectively **"Respondents"**) produce discovery for use in the UK Proceedings, including documents and depositions.

3. Nothing in this statement is intended, and I am not authorized, to waive any legal privilege on behalf of Mr. Azima. I am authorized by Mr. Azima to make this Declaration on his behalf.

4. As detailed below, the pending UK Proceeding is a counterclaim brought by Mr. Azima against the Ras Al Khaimah Investment Authority (**"RAKIA"**) – the sovereign wealth fund of Ras Al Khaimah (**"RAK"**) – alleging hacking and a scheme to cover-up that hacking. Mr. Azima has joined other Defendants to his counterclaim, namely: Mr James Buchanan (**"Buchanan"**) (RAKIA's authorised representative at the material time), Dechert LLP (a law firm) (**"Dechert"**), and Mr. Neil Gerrard (an English lawyer and a partner at Dechert at the material time) (**"Gerrard"**) (together with RAKIA **"the UK Defendants"**). Mr. Stuart Page (a private investigator who was working on RAKIA's behalf at the material time) (**"Page"**) was previously joined as a Defendant but has settled with Mr. Azima and Mr Azima has discontinued his claim against him.

**The Procedural Posture of the UK Proceedings**

5. On 30 September 2016, RAKIA sued Mr. Azima regarding a commercial dispute. RAKIA's claim relied on a substantial quantity of Mr. Azima's hacked and stolen private and personal data. RAKIA admitted that the materials were stolen but claimed to have

obtained them innocently from sources on the internet. In addition to resisting the merits of the claim against him, Mr. Azima alleged that RAKIA was responsible for hacking his computers and electronic data and for publishing the hacked material on the internet (such that RAKIA's claim to have discovered the materials on the internet was a sham). Mr. Azima brought a counterclaim against RAKIA for the hacking and related wrongs, seeking injunctive relief and damages. He also raised a defence of set-off to the sums claimed by RAKIA.

6. The trial of RAKIA's claims took place in January and February 2020 (the '**First Trial**') before Mr. Andrew Lenon QC, sitting as a Deputy Judge of the High Court (the '**Deputy Judge**'). Judgment was given on 22 May 2020 ('**HC Judgment**').

7. The Deputy Judge found that RAKIA's account of having discovered the hacked materials on the internet was not true but found overall that RAKIA's responsibility for the hacking had not been proven. The Deputy Judge therefore dismissed the counterclaim on the basis that RAKIA's responsibility for the hacking had not been proven.

8. Mr. Azima was granted leave to appeal the Deputy Judge's findings on the hacking among other findings. In support of his appeal, Mr. Azima also sought to rely on new evidence indicating RAKIA's responsibility for the hacking. Following a hearing from 2-4 March 2021, the Court of Appeal gave judgment on 12 March 2021 (the '**CA Judgment**'). The Court of Appeal, among other things, overturned the dismissal of the hacking counterclaim and remitted the counterclaim for a further trial before a new Judge and admitted the new evidence relating to the hacking. The Court of Appeal also noted that the findings of the Deputy Judge on the hacking issue will not be binding in the new trial.

9. Following the CA Judgment, Mr. Azima applied to the English High Court to amend his

Counterclaim by adding additional parties as Defendants, namely, Gerrard, Dechert, Buchanan, and Page. On 16 July 2021, the UK Court ordered that the Additional UK Defendants were to be joined to the UK Proceedings. Mr. Azima has since settled with Mr. Page and amended his counterclaim further. Mr. Azima's most recent draft, amended counterclaim is at (**Exhibit A**) (**"the Draft Counterclaim"**).

**Insight and Gadot**

10. Insight and Gadot are both Florida registered entities. **(Exhibit B)** **(corporate records)**. Both entities are associated with Mr. Amit Forlit, who it is alleged in the Draft Counterclaim conspired with the UK Defendants. The Draft Counterclaim alleges that:

   a. Mr. Forlit, through Insight and Gadot, were engaged by Mr. Page to conduct investigation into Mr. Azima and others, and that the investigation included hacking;

   b. Respondents provided to Mr. Page monthly investigation reports, some of which included extracts of hacked data;

   c. After Mr. Azima brought a counterclaim against RAKIA, Mr. Forlit and the UK Defendants conspired to concoct a false story about how the UK Defendants came to possess Mr. Azima's stolen data; and

   d. Starting in or around February 2015, Respondents were paid at least $230,000 per month for the above work.

11. In invoices provided by Respondents to Mr. Page, Respondents sought payments via wire transfers to US-based banks: Bank of America, J. P. Morgan – Chase, and Citibank.

4

**(Exhibit C) (invoices)**.

12.   Mr. Forlit is the authorized person listed in Gadot's 2021 Annual Report (**Exhibit B**)., .

**Summary of the factual case against RAKIA and the Additional Defendants**

13.   The Draft Counterclaim sets out the case against the UK Defendants. Rather than repeating the contents of that pleading in detail in this Declaration, I respectfully refer the Court to that document and set out below a summary of the key elements of the case relating to Respondents. A summary of the case against the UK Defendants is set out at § 101-111 of the Draft Counterclaim (which draw on the more detailed particulars given earlier in the document). The below summary is based on the allegations in the Draft Counterclaim, which is supported by documentary and affidavit evidence, as described in more detail below.

*The Hacking of Mr. Azima*

14.   There is no dispute in the UK Proceedings that Mr. Azima was the victim of hacking, or that RAKIA has had possession of the hacked materials:

   a.   In August and September 2016, links to around 30 GB of Mr. Azima's personal and private data appeared online. Mr. Azima was unable to access the links, but RAKIA has since provided copies of the data, which spanned more than 10 years and included a substantial number of privileged communications. The links were to anonymous peer-to-peer platforms known as BitTorrents and appeared on websites that disparaged Mr. Azima. At the First Trial, it was common ground that this material had been obtained without Mr. Azima's authority by hacking his electronic devices and/or email accounts.

5

    b.    On 23 September 2016, RAKIA sent a pre-action letter to Mr. Azima, making allegations based on documents included within the hacked materials. A claim was issued shortly afterwards, on 30 September 2016, relying very heavily on the hacked material.

    c.    No other party has sought to rely on the hacked material in any proceedings in any jurisdiction.

*Mr. Page and the "Project Update" Identifying Mr. Azima as an Enemy*

15.    In around March 2015, RAKIA believed that Mr. Azima was managing a "*team*" in the U.S. working to draw attention to allegations of human rights abuses in RAK. The evidence for this is set out in a document created by RAKIA's advisors and called "RAK Project Update Report" (the '**Project Update**'). The Project Update makes clear that RAKIA viewed Mr. Azima as an enemy of RAK and proposed that action be taken against Mr. Azima and his team, including steps to "*gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans.*"

16.    In January 2022, Mr. Page provided a sworn affidavit to Mr. Azima (**Exhibit D**) (the "**Page Affidavit**"). The Page Affidavit states that the Project Update was prepared by Mr. Forlit for Mr. Page. Mr. Forlit worked for Respondents Insight and Gadot. Mr. Page engaged Respondents to conduct an investigation into a Dr. Khater Massaad (the former CEO of RAKIA) (**"Massaad"**) and others (including Mr Azima) for a project referred to as "Project Beech" or "Project Beach." For that project, the Respondents prepared monthly reports from February 2015 to May 2020. Mr. Forlit provided the reports to Mr. Page who then provided them to the UK Defendants: Gerrard and Buchanan, as well as the Ruler of RAK. At least some Project Update reports contained extracts of hacked communications,

6

and, according to the Page Affidavit, it would have been clear to any reader that the communications were hacked.

17. According to the Page Affidavit, Mr. Page was paid approximately $300,000 per month for his work, and he paid the Respondents approximately $250,000 per month. As discussed above, Respondents invoiced Mr. Page and sought payment through US banks.

18. Shortly after the Project Update was distributed, between March 2015 through August 2016, more than 150[1] malicious 'spear-phishing' emails were received by Mr. Azima and others associated with him. Common features of these emails point to a single 'spear-phishing' campaign targeting Mr. Azima and associated persons.

*The threat against Mr. Azima and the creation of the torrent sites*

19. Evidence at the First Trial established that in July 2016, Mr. Gerrard pressured Mr. Azima to assist RAKIA in its dispute with Massaad. Mr. Gerrard told Mr. Azima that if he did assist RAKIA, and if Massaad did not agree to a settlement of his dispute, Mr. Azima would be "*collateral damage*" in the ensuing conflict that would then occur between RAKIA and Massaad. At the time of this threat, Mr. Azima was unaware that he had already been hacked.

20. The dispute was not settled and within weeks of this meeting, blog sites were created that disparaged Mr. Azima and contained links to over 30GB of Mr. Azima's confidential and/or private data on torrent sites (the '**Torrents**'). Though Mr. Azima was never able to access the data, RAKIA was, and has disclosed to Mr Azima a copy of the data that it claimed was on the Torrents. The stolen data included:

---

[1] It is likely that significantly more such emails were received than those that have been identified. A substantial number of emails are likely to have been caught by spam or virus filters and/or deleted by the time the emails were identified (which for the vast majority was in mid-2020).

  a.  Emails taken from 10 email accounts belonging to Mr. Azima and Mr. Adams (the Chief Financial Officer of Heavylift, one of Mr. Azima's companies);

  b.  Mr. Azima's appointments, call history, photos, recordings, SMS messages, Viber messages, videos, voicemails, WhatsApps, contacts and notes; around: (i) 161,702 emails; (ii) 13,736 photographs or other images; and (iii) 840 voice recordings; material of a personal nature about Mr. Azima and his family.

21. In 2018 and 2019, additional links to Mr. Azima's stolen data were added to the blog sites disparaging Mr. Azima.

*Subsequent hacking by Mr. Forlit at the Direction of Mr. Gerrard, Mr. Handjani, and Mr. Page*

22. On February 7, 2022, Mr. Stuart Page provided a witness statement in the case captioned *Stokoe Partnership Solicitors -v- (1) Mr Patrict Tristram Finucane Grayson (2) Grayson + CO Limited (3) Dechert LLP and (4) Mr David Neil Gerrard* (Claim Number: QB-2020-002492) ("Stokoe Proceedings") (**Exhibit E**) (hereinafter "**Third Page Witness Statement**"). The Third Page Witness Statement states that, in around February 2020, Mr. Handjani invited Mr. Page to two meetings with Mr. Handjani and Mr. Gerrard, at which they instructed Mr. Page and an Israeli hacker, Mr. Amit Forlit, of Insight Analysis and Research LLC ("Insight"), to determine who was funding Mr. Azima's and other's litigation relating to the Emirate of Ras Al Khaimah and Dechert LLP. Mr. Handjani also received Insight's work product through a report sent by Mr. Page using the Signal encrypted messaging service.

*Perverting the Course of Justice*

23. In addition to describing the role played by Mr. Forlit in the investigation of Mr. Azima, including the use of hacking, the Page Affidavit also details a widespread campaign by the UK Defendants and others, including Mr. Forlit, to lie to the UK courts about how the UK Defendants came to possess Mr. Azima's hacked data. In February 2022, Mr Majdi Halabi (**"Halabi"**) also swore an affidavit corroborating this conspiracy to commit fraud upon the UK court. (**Exhibit F**).

24. Specifically, at the first UK trial, RAKIA's case to the UK court was that an Israeli journalist, Halabi, "discovered" Mr. Azima's hacked data while conducting regular Google searches. Page and Halabi both presented witness statements to the UK Court supporting this narrative, and Gerrard and Buchanan – along with Page and Halabi – testified at trial in support of this narrative.

25. However, the Page Affidavit and Halabi Affidavit state that this story of innocent discovery by Halabi was false. The affidavits state that Forlit provided Page with links to Mr. Azima's stolen data. The affidavits make clear that the UK Defendants, along with Mr. Forlit and others, concocted the false story to avoid telling the UK Court the true story about how RAKIA came into possession of Mr. Azima's stolen data.

26. According to the Page Affidavit and the Halabi Affidavit, Gerrard, Buchanan, Forlit, Page, and Halabi met several times between 2018 and 2019 in London, Cyprus, and Switzerland to rehearse and coordinate the false story and prepare their fraud on the UK court. The Switzerland meeting was held at Hotel Moosegg outside of Bern, and at that meeting, Gerrard helped Page and Halabi rehearse their false testimony in detail.

9

*Additional Evidence of Document Destruction*

27. On February 7, 2022, Mr. Paul Robinson, another private investigator, provided a witness statement in the Stokoe Proceedings (**Exhibit G**) (hereinafter "**Robinson Witness Statement**"), in which Mr. Robinson explains the following:

    a. Mr. Robinson (and his companies) had undertaken various engagements for a Mr. Nicholas Del Rosso, including to gather information on Mr. Azima, from 2016 onwards. Between early 2019 and June 2020, Mr. Robinson received instructions from a Mr Patrick Grayson (another private investigator). Mr. Robinson understood that all but one of those instructions were given to him by Mr. Grayson on behalf of Mr. Del Rosso.

    b. On 25 June 2020, Mr. Robinson met with Mr. Grayson in London, and Mr. Grayson directed him to destroy and sanitise (i.e. create new versions of documents without important information or identifiers) any materials that could connect Mr. Grayson or Mr. Del Rosso to any of the work that Mr. Robinson had carried out for them.

    c. Mr. Robinson destroyed or sanitised various documents, including 'sanitizing' an invoice that Mr. Robinson had sent to Mr. Del Rosso for gathering information on Mr. Azima.

28. Mr. Del Rosso is the President and owner of Vital Management Services Inc ("**Vital**"), a private investigations firm. It is Mr. Azima's case that Vital was one of RAKIA's agents who instructed at least two 'hack for hire' firms to carry out the hacking of Mr. Azima's computers on RAKIA's behalf. RAKIA has admitted that Vital was instructed by Dechert (RAKIA's English solicitors) to carry out work for RAKIA and provide certain instructions to one of the 'hack for hire' companies (CyberRoot).

**Discovery Sought**

29. Prior to the first UK trial, the parties undertook an extensive disclosure/discovery exercise. However, the role of Respondents and Mr. Forlit was concealed by RAKIA at that time and documents within the possession and/or control of Respondents were not included in the search undertaken by RAKIA.

30. Because of the role played by Mr. Forlit and Respondents, detailed above, it is clear that Respondents have documents relevant to Mr. Azima's Amended Counterclaim. In particular, the information provided by Mr. Page in the Page Affidavit and Third Witness Statement, and the invoices attached at **Exhibit C** demonstrate that Respondents were paid substantial sums for the investigative work they performed for RAKIA from February 2015 to present, including both hacking and the conspiracy to defraud the UK court in the first trial. The Robinson Witness Statement also demonstrates that at around the same time Mr. Forlit was being instructed by Mr. Gerrard, Mr. Handjani, and Mr. Page, other agents of RAKIA were being instructed to destroy and sanitize documents. Accordingly, on information and belief, Respondents have information, documents, and material which would provide evidence directly relevant to the issues in Mr. Azima's Amended Counterclaim, and the information and documents have not yet been disclosed in the UK Proceedings.

31. Draft subpoenas detailing the documents and communications sought by Mr. Azima are attached (**Exhibit H**). In summary, Mr. Azima seeks two narrow and discrete categories of documents. First, Mr. Azima seeks documents and communications related to the investigation work performed by Mr. Forlit and Respondents between February 2015 and March 2020, including for example, the monthly reports prepared for RAKIA, the underlying hacked documents supporting those reports, and invoices, payment records, and

communications about that investigative work. Second, Mr. Azima seeks documents and communication related to Mr. Azima's first UK trial and the conspiracy to mislead the court about the origin of Mr. Azima's hacked data. This request includes communications with the co-conspirators who developed and rehearsed the false testimony, as well as information about meetings with those conspirators.

32. With regard to the requested depositions, Mr. Azima seeks from each Respondent a Rule 30(b)(6) deposition of a company representative with knowledge of the two issues discussed above: (1) the investigation of Mr. Azima, related hacking, and preparation of investigation reports; and (2) the subsequent cover-up and scheme to submit false evidence to the UK Court and destroy and sanitize documents. Mr. Azima also requests that the Respondents be directed to produce their employee, Mr. Forlit, for a deposition on these same subjects.

33. For these reasons, it is respectfully requested that this Court grant the Application in its entirety.

34. Pursuant to 27 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Dated: 8th March 2022

*Dominic Holden*

_____
**Dominic Holden**