# Exhibit G

Claimant<br>
P Robinson<br>
2nd<br>
Exhibit PR2<br>
Dated 7 February 2022

**IN THE HIGH COURT OF JUSTICE**                    Claim no. QB-2020-002492
**QUEEN'S BENCH DIVISION**

**B E T W E E N : -**

**STOKOE PARTNERSHIP SOLICITORS**

**Claimant**

**and**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**
**(2) GRAYSON + CO LIMITED**
**(3) MR STUART ROBERT PAGE**
**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**
**(5) DECHERT LLP**
**(6) MR DAVID NEIL GERRARD**

**Defendants**

_____

**SECOND WITNESS STATEMENT OF**
**PAUL ROBINSON**

_____

I, **PAUL ROBINSON**, of 6 Belvedere Walk, Haywards Heath, West Sussex, RH16 4TD, **WILL SAY** as follows:

**INTRODUCTION**

1. I am a director of a corporate research and investigation firm.

2. The facts and matters set out in this witness statement are either derived from my own knowledge or are derived from other sources or documents that I have seen and which, in all cases, I believe to be true. Where I refer to facts and matters below that are within my own knowledge, they are true. Where I refer to information supplied to me by others, its source is identified and it is true to the best of my knowledge and belief. I do not waive privilege in relation to any information or materials which I reference in my statement.

3. There is now produced and shown to me, marked "**PR2**", an exhibit containing true copies of paginated documents to which I will refer in this statement. References below to page numbers are to the contents of that exhibit.

4. I make this witness statement further to the affidavit I swore on 6 July 2020 in Claim No. QB-2020-002218 and my witness statement dated 14 May 2021.

5. The purpose of this statement is to provide further details of my dealings with Mr Grayson and to provide details of my understanding of Mr Nicholas Del Rosso's involvement in the enquiries that Mr Grayson instructed me to carry out.

6. This witness statement has been prepared on the basis of my own knowledge and records of the relevant events and through consultation with my legal advisers.

**BACKGROUND**

(1) **Nicholas Del Rosso**

7. Mr Del Rosso is a private investigator and managing director of Vital Management Services ("**VMS**"), based in North Carolina, USA. I was first introduced to him through another private investigator in around 2016. Over the following years, Mr Del Rosso instructed me to carry out a number of different enquiries for which I received payment.

8. In my first witness statement, I describe in detail the instructions I received from Mr Grayson between early 2019 and June 2020. With the exception of one enquiry, Project Maxwell, which I give further details of below, my understanding is that all of these enquiries were carried out on behalf of Mr Nicholas Del Rosso ("**the Grayson enquiries**").

9. With the exception of the £5,000 I refer to in my first witness statement and the Project Maxwell enquiry, Mr Del Rosso's company, VMS, paid my company for all of the Grayson enquiries.

**CONTACT WITH MR GRAYSON**

**(1)** **Signal Messages**

10. In my first witness statement, I exhibited a number of Signal messages between Mr Grayson and me. These messages mostly covered the period from January 2020 to June 2020. I now refer to a number of additional Signal messages between Mr Grayson and me spanning the period June 2019 to January 2020 (**PR2/1-16**).

11. With the exception of a number of messages on 9 October 2019 concerning Project Maxwell (**PR2/13** - "Maxwell Wright – profile"), all are connected to the enquiries that Mr Grayson instructed me to carry out and paid for by Mr Del Rosso.

**(2)** **Meeting on 25 June 2020**

12. On 24 June 2020 I travelled to London to meet Sharon Leahy Clark and Adrian Davidson to discuss the possibilities of my company merging with Page Corporate Investigations Limited. At 12:02 I received a call from Mr Grayson (**PR2/1580**). Whilst I cannot recall the precise details of what he said, I remember that he said there was a problem. It was as a consequence of that conversation that Mr Grayson and I changed

the phone settings on the Signal App, so as to ensure that the messages disappeared within 30 seconds **(PR2/1580).** There was a further call and resetting of message deletion times by Mr Grayson **(PR2/1579)** that evening and in one of these calls he asked me to meet him urgently at the Goring Hotel the following day.

13. On 25 June 2020 I purchased a train ticket to travel to London (**PR2/17**) for the meeting with Mr Grayson. As I walked towards the Goring Hotel at about 10:30 am my attention was drawn to a black minivan parked at the side of the road. Mr Grayson was in the back and beckoned me to get in, which I did. When I got into the vehicle Mr Grayson asked me for my mobile phone, I gave it to him and after initially trying to turn it off, he handed it to the driver of the minivan, who he referred to by first name. I thought this was odd but nevertheless did what he asked me to. The minivan moved off and we drove around Hyde Park. I cannot recall the precise details of the conversation, but the gist of what Mr Grayson said was that "we" have a problem and that one of the people I had been using to carry out the Grayson enquiries, had been passing information to "the other side". Mr Grayson told me that there may be legal proceedings. Mr Grayson then asked me to name my sources and I told him I had instructed Mr John Gunning to deal with the sensitive work. Mr Grayson was clearly very anxious and concerned.

14. During the journey, Mr Grayson asked me to destroy and / or sanitise any material which could connect both him and Mr Del Rosso to any of the work that I had carried out for them. This concerned me greatly. Before the minivan dropped me at Victoria Station, Mr Grayson handed me an envelope with cash inside. He told me it was half of the money he had agreed to pay me for an investigation into the Claimant in these proceedings. When I later counted the money, it was £5,000.

15. After the meeting I went straight back to my office and told my colleagues, Michelle Jenkins, my sister, and Owain Jenkins, her husband, what had happened. I asked them to help me identify the documents that I was to either destroy or sanitise. Over the course of the next several days, this is what we did.

**(3)** **Invoices**

16. I have collated a number of invoices which were issued by both Company Diligence and Company Documents Ltd to both Mr Del Rosso and VMS for work which I carried out from January 2016 to April 2020. These documents include invoices for the work that was carried out as part of the Grayson enquiries (**PR2/18-54**).

17. Some of the invoices have been sanitised, as Mr Grayson requested, and six invoices (dated 1/11/2019, 26/02/2020, 16/03/2020, 2/04/2020, 9/04/2020 and 7/06/2020) are not the original invoices which I sent to Mr Del Rosso. When these invoices were first issued, I sent them by email to Mr Del Rosso at reverendmack@protonmail.com and they were subsequently paid. Following service of proceedings in claim QB-2020-002218 upon me on 1 July 2020, I spoke to Mr Del Rosso who told me not to mention his name in relation to this work and to keep his name out of the entire matter. In an effort to distance myself from Mr Del Rosso, I deleted the six invoices. Before I deleted the invoices, I made a note of the detail set out therein. I subsequently used this detail to recreate the six invoices that I now exhibit. Whilst the handwritten note is no longer available, I have checked my bank statements, and confirm that payment for the invoices entered my bank account within days of the invoice date.

18. Two further points of detail concerning the invoices:

    18.1. The narrative on the spreadsheet for the invoice dated 16 March 2020 (**PR2/22**) refers to "RS" (Radha Stirling) and to "P" (Patrick Grayson).

    18.2. The 10 July 2019 invoice (**PR2/27**) contains the following narrative: "*OP Dotty – Adress (sic) Trace – as instructed by PG £250*". The PG referred to is Mr Grayson.

19. I have collated a number of relevant Company Diligence bank statements for the period November 2018 to June 2020. Copies of these statements are exhibited at **PR2/55-70**. I have redacted a number of entries as they are not relevant to the present matter. The ones that have been left unredacted show that payments were received from VMS and paid out to John Gunning. All of these payments (both receipts and debits) were for work carried out in relation to the Grayson enquiries. The one exception is the £750 payment from Mr Grayson on 23 January 2020. This payment was for an enquiry Mr Grayson instructed me to carry out, which was unconnected to these proceedings. The reference on the bank statement is "Project Maxwell", this was the name attributed to this particular enquiry.

**NICHOLAS DEL ROSSO**

(1) **Payments**

20. From about 2016, Mr Del Rosso instructed me to carry out a number of different enquiries for which I received payment. On 28 January 2018, my company (Company Diligence) entered into a consultancy agreement with VMS for which VMS made a payment of £500 per month (**PR2/71-73**).

21. Whilst the Grayson enquiries centred upon what I now understand to have been matters related to litigation linked to Ras Al Khaimah ("RAK"), some of the prior research investigations upon which I was directly instructed by Mr Del Rosso also concerned UAE matters. An example of this concerns Mr Farhad Azima who, I understand from press reports, was involved in litigation with RAK. Mr Del Rosso instructed me to carry out investigations including research on the deep web concerning Mr Azima. I instructed a subcontractor who undertakes deep web research and they produced a lengthy report on Mr Azima (**PR2/74-1552**). I then delivered this report to Mr Del Rosso. The invoice for that particular investigation is dated 27 June 2016 and has the narrative "Due Diligence – deep web research" (**PR2/46**). This is an example of how an invoice might be sanitised, removing details of the target of the enquiry (in this case Azima) and replacing it with an anodyne description.

22. Prior to the Grayson enquiries, all instructions I received from Mr Del Rosso came directly from him and not through Mr Grayson, with payment made by Mr Del Rosso. When I first spoke to Mr Grayson in connection with the Grayson enquiries he informed me that he had only recently returned from visiting Mr Del Rosso in North Carolina where he and Mr Del Rosso had discussed the matters which Mr Grayson was about to instruct me to carry out. When Mr Grayson did instruct me in relation to the Grayson enquiries, he informed me that invoices for this work should be directed to Mr Del

       Rosso who would settle them. As things turned out, whilst Mr Grayson paid me the £5,000 in cash to which I refer in my first witness statement, VMS made the remaining payments in respect of the Grayson enquiries.

23. I believed that the reason for the change in the way that Mr Del Rosso instructed me was due to the sensitive nature of the material sought and I assumed that Mr Del Rosso may have wished to distance himself from the actual instructions.

(2) **Legal Fees**

24. On 1 July 2020, I received a letter from the Claimant, enclosing among other things the claim form in QB-2020-002218 and an application notice seeking *Norwich Pharmacal* relief against me: (**PR2/1561-1564**).

25. On the same date I called Mr Del Rosso and explained what had happened. The conversation was brief and he asked me not to mention his name. He informed me that his American lawyer would contact me and that he would pay any legal fees I incurred in relation to the proceedings. A short time later, Brandon Neuman (Mr Del Rosso's American lawyer) called me. A number of emails were exchanged (**PR2/1565-1568**) between him and me in connection with the matter.

26. In a conversation over Signal, Mr Neuman informed me that, as he was based in the USA, he could not assist me and he advised me to contact a lawyer based in the United Kingdom, which I did. Mr Neuman also informed me that rather than Mr Del Rosso paying for my legal fees directly, he would set up a loan agreement to facilitate this, which is what happened. On 2 July 2020, Company Documents entered into a loan agreement with VMS for the sum of $25,000. The money was due to be repaid on 1 July 2021 and the rate of interest was 8 % per annum (**PR2/1569**).

27. The loan was never repaid, and I have not been asked to repay it to date.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed

       Paul Robinson

Dated       07th February 2022