Claimant<br>
S R Page<br>
3rd<br>
Exhibit SRP3<br>
Dated 7 February 2022

<u>IN THE HIGH COURT OF JUSTICE</u>       Claim no. QB-2020-002492
<u>QUEEN'S BENCH DIVISION</u>

B E T W E E N : -

STOKOE PARTNERSHIP SOLICITORS

<b><u>Claimant</u></b>

and

(1) MR PATRICK TRISTRAM FINUCANE GRAYSON
(2) GRAYSON + CO LIMITED
~~(3) MR STUART ROBERT PAGE~~
~~(4) PAGE CORPORATE INVESTIGATIONS LIMITED~~
(5) DECHERT LLP
(6) MR DAVID NEIL GERRARD

<b><u>Defendants</u></b>

---

**THIRD WITNESS STATEMENT OF**
**STUART ROBERT PAGE**

---

I, **STUART ROBERT PAGE,** of 14 Montpelier Road, London, W5 2QP, **WILL SAY** as follows:

A.  INTRODUCTION

1. I am the same Stuart Page who has made two previous witness statements in these proceedings (dated 12 March 2021 and 14 May 2021 respectively). I was formerly the Third Defendant to these proceedings.

2. I make this statement in connection with the application of Stokoe Partnership Solicitors ("**Stokoe**"), the Claimant, to adjourn the trial in these proceedings, which I understand will be determined at a pre-trial review hearing on 11 February 2022. I have therefore prepared this statement in a limited time period with limited reference to documents, and so it is not as detailed as it could be.

3. Subject to this point, and except where I indicate otherwise below, the facts and matters set out in this witness statement are within my own knowledge and I believe them to be true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

4. In this witness statement I refer to documents which together comprise exhibit **"SRP-3"**. References to page numbers in bold in squared brackets in this witness statement are references to that exhibit.

B.  ENGAGEMENT IN RAS AL KHAIMAH

5. In 2008, I was approached by Khater Massaad ("**Khater**"), the CEO of RAK Ceramics who was an adviser to His Highness Saud bin Saqr Al Qasimi (**"Sheikh Saud"**, and later, "**the Ruler**"), then the Crown Prince of Ras Al Khaimah ("**RAK**"). I was instructed to assist Sheikh Saud in a dispute with his half-brother. This engagement came to an end in 2010 when Sheikh Saud's father passed away and Sheikh Saud succeeded him as the Ruler.

6. In 2014, I read a press report that there was an ongoing investigation into financial irregularities at RAK Airways. I contacted an associate and asked whether there was anything I could assist with. I had a meeting with the Ruler but at first nothing came of it. In around January 2015, a meeting was set up between me and Jamie Buchanan ("**Jamie**") who was then CEO of RAK Development LLC and adviser to the Ruler. Shortly afterwards, Jamie and I had another meeting in Dubai and he asked me to assist

483

with an investigation into Khater who it was believed had misappropriated a very significant amount of RAK government funds. At that stage, I was instructed to investigate Khater's assets, his connections with Iran, his alleged links to Hezbollah in Lebanon and his relationship with Viktor Bout (who was serving a sentence in the US for arms trafficking), and to look into whether Khater was working with other members of the Ruler's family to overthrow the Ruler.

7. Soon after I received these instructions from Jamie, I instructed Amit Forlit ("**Amit**") from Insight to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service) and his team had experience of working in military intelligence on behalf of the Israeli Defence Force. The project was given the codename "Project Beech" which was used between me, Amit and his team. The investigation work was undertaken using three main sources of intelligence - human intelligence, open-source research, and what is known as SIGINT. SIGINT is a term that originates from intercepting communications such as radio signals and tapping a target's phone. The term is still widely used in the intelligence community (including the commercial investigations industry) to describe the hacking of confidential emails and the unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

8. My main point of contact was Amit, but I know that he used several analysts, some of whom were located outside Israel.

9. In about June 2015, approximately five months after receiving Jamie's instructions, I received a telephone call from Neil Gerrard ("**Neil**"), a partner in the law firm Dechert LLP ("**Dechert**") in which he said that he was a lawyer instructed by a mutual client, and he suggested that we should meet. The following day we met in Dechert's London office. Over the course of the following five years, I met Jamie frequently both in RAK and London, and also Neil and Amit on multiple occasions, to discuss various aspects of the investigations that I was engaged in, some of which are detailed below. Some meetings took place in Dechert's London office. However, to the best of my knowledge and belief, there came a time when Neil was uncomfortable with this as he did not want a written record that he was meeting Amit or Amit's team. After this, the meetings took place in other locations, such as hotels. Whilst we all did meet together, I know that Neil and Amit had a direct line of communication that did not involve me.

10. I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

C. **METHOD OF REPORTING AND COMMUNICATIONS**

11. Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. The reports usually included an executive summary, some raw data that had been obtained as a result of the investigation, some analysis of the data and recommendations and action points. I also recall that some of the reports contained extracts from confidential documents, with the document itself appended to or embedded in the report. Given the content of these extracts, it was obvious that they had been obtained as part of Amit and Insight's SIGINT work, in other words as a result of unauthorised access to computers and other devices.

12. Strict protocols for the handling and the sharing of the reports between myself, the Ruler and Jamie (and Neil on occasions where Jamie asked me to provide him a copy of selected reports) were introduced. The object of the protocols was to ensure that there was no paper trail left for others to find and that the reports themselves were destroyed.

13. As part of the effort to make sure that the reports were only seen by those who we wanted to see them, an email account was created that only Amit, specified members of his team and my personal assistant, Caroline Timberlake ("**Caroline**") could access. A draft email would be prepared with instructions and a copy of the report. The email would never be sent, but the report would be downloaded from the draft email account onto a laptop that was not connected to any server, printed from a printer which was not connected to a network, and the draft message was then overwritten. Amit (or one of his team) then sent a secure coded message informing me or Caroline that there was something to be reviewed. The coded message would then be deleted.

485

14. The printed copy of the report would be hand delivered to Jamie for his review, or would be left at his hotel when he stayed in London. The Ruler instructed me that I was not to send him anything electronically, which meant that I had personally to hand-deliver all the reports to him in RAK. I did this as part of our regular private meetings, which took place every three to four weeks.

15. As for Neil, when Jamie asked me to send the reports to him, I initially sent them via courier (or Caroline would hand-deliver them) to Neil or his secretary at Dechert's office in London. However, on one occasion, a report was opened by somebody other than Neil or his secretary in Dechert. Given the content of the report, Neil was very concerned and, after this, he asked me to send any future reports to his home address in East Sussex. Courier receipts and emails relating to the delivery of these reports to Dechert's office and Neil's home address are exhibited at [**SRP3/2-22**].

16. Every few months, Jamie returned the reports to me so that I could destroy them securely, which I did.

17. Any matters emanating from the reports or wider investigations that required Neil, Jamie and I to discuss them would either be discussed face to face or via Confide, and later Signal, a secure and encrypted network.

D. **AZIMA MATERIAL**

18. During one of my regular meetings with Jamie in early 2015 he mentioned Farhad Azima ("**Azima**"). This was the first time I had heard that name. Some time after that, Jamie told me that Khater had threatened a negative publicity campaign against the government of RAK and the Ruler and asked me to keep my eyes and ears open for anything that could be considered damaging to RAK.

19. On 22 January 2020, a trial concerning a dispute between Ras Al Khaimah Investment Authority ("**RAKIA**") and Azima commenced before the High Court in London (the "**Azima Trial**"). On 29 January 2020 I gave evidence at the Azima Trial and exhibit a transcript of that evidence [**SRP3/23-50**]. In my witness statement and testimony at the Azima Trial, I stated things that were inaccurate. I have subsequently corrected these inaccuracies in an affidavit dated 7 January 2022 that was prepared for an application Azima is making before the Supreme Court [**SRP3/51-62**].

486

20. In summary, my evidence at the Azima Trial was that links to confidential material belonging to Azima, which had been obtained unlawfully and uploaded to the internet, had been drawn to my attention in 2016 by a journalist, Majdi Halabi ("**Majdi**"). That is inaccurate. It was in fact Amit who brought the links to the material to my attention.

21. However, between the discovery of the material in 2016 and the Azima Trial, once it became apparent that RAKIA wanted to rely on this material for its claims against Azima, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit had told me about the data, and Amit told me that he did not want his name disclosed in legal proceedings. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK because, at that time, there were no diplomatic relations between the State of Israel and the UAE. There followed a series of meetings between Neil, Jamie, Amit and me to discuss how to respond to the enquiries from Azima's legal team as to how the material had been discovered by RAKIA. During one of these meetings, Amit suggested that we simply introduce another person to the story and say that this person was the one who discovered the material. It was against that background that I met Majdi. I discussed the cover story with Neil and Jamie and we agreed to meet to work out a plan.

22. In October and November 2018, there were two meetings in Cyprus, which were attended by Amit, Neil, David Hughes ("**David**") (a former colleague of Neil's at Dechert, where both had been partners, but at the time working at Stewarts Law LLP), Majdi, and me, at which we agreed that we would proceed with the cover story that Majdi had discovered the material. As I recall, Jamie and I travelled together to the first of those meetings, but to the best of my recollection he was not present at the second meeting. I also recall that David voiced his scepticism as to whether the story was credible, and did not think it would work, but Neil made it clear that this was the best way forward and that David would have to go along with it.

23. As the Azima Trial approached, Amit called me and told me that Neil wanted to meet with me, Amit, Majdi and Jamie to go through the evidence that we were to give at the Azima Trial. We then settled on Switzerland as the location for the meeting because it was convenient for Neil given the time constraints arising from his other work commitments. The meeting took place between 1 and 4 December 2019 in a small hotel outside Bern in Switzerland. The attendees were Neil, Amit, Majdi and me, and Jamie

487

did not attend. During our stay at the hotel, we went through a mock trial, with Neil acting as both judge and cross-examining counsel. This was all done to perfect the cover story as to how the hacked material had been discovered. At one point during the time we spent together, Neil said to me something to the effect of "if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years."

24. Given the nature of what we were discussing at the hotel, a number of security protocols were put in place. I told Neil to leave his mobile phone at home or to switch it off, and I provided burner phones for me and him to use. To avoid detection, I did not fly to Switzerland but instead took a train via Paris, Strasbourg, Basel and then to Bern.

E. **RAC MEETING**

25. Very shortly after I gave evidence in the Azima Trial, I was contacted by Amir Handjani ("**Amir**"), a very close adviser to the Ruler. I had first seen Amir in the court room during the Azima Trial and I had given him my mobile number. Amir suggested that we meet for a coffee that weekend. On 1 or 2 February 2020, we met in a coffee shop in London's West End for about thirty minutes. One of the topics of conversation during that meeting was the litigation that RAK and the Ruler were involved in. A short time after that meeting, he contacted me again and said that Neil thought it would be a good idea if the three of us met. Neil was a member of the RAC club, a private members' club on Pall Mall, and so we arranged to meet there for breakfast a few days later.

26. During that breakfast, one of the topics of conversation that came up was the funding of various proceedings involving RAK. We had recently been present at the Azima Trial, and the funding of the Azima proceedings had been a topic of conversation for a number of years by that point. A few days beforehand, on 28 January 2020, further proceedings had been issued by Karam Al Sadeq ("**Al Sadeq**") against various defendants, including Dechert and Neil, which related to RAK and which had been reported in the press. Neil then said words to the effect of "we need you to find out who is funding all of this". Neil and Amir then instructed me to do this. At this stage, I was still receiving my payment from RAK and so they paid for whatever investigations I carried out.

27. Shortly after the meeting, I instructed Amit to investigate who was funding these cases. Neil was aware that I used Amit to carry out these types of investigations and he was aware of the type of methods that Amit used, including SIGINT.

488

28. For completeness, I wish to record that at that stage I did not know about Stokoe's representation of Al Sadeq.

F. **GATWICK SERVICE STATION MEETING**

29. On my instructions, and based upon what Neil had asked me to do at the RAC meeting, Amit produced a report sometime in April or May 2020. I recall that he was sensitive about who saw this report.

30. I sent the report by Signal to Amir. Neil and I agreed to meet at a service station near Gatwick Airport to show him the report. We chose that location because Neil believed that he was under surveillance, and that this was somewhere where he could not be easily observed covertly.

31. I read the report at the time and whilst I cannot now recall the specific contents, I do remember that it dealt with how the RAK-related litigation was being funded.

32. When I met Neil, I gave him a copy of the report and he read it, but I did not let him take the document with him, and I took the report away with me and destroyed it. I do recall that Neil did not look surprised or concerned by the contents of the report, which I found strange at the time.

G. **STOKOE PROCEEDINGS**

33. Some time before I was served in these proceedings, I received a call from Amir who told me that, on the Ruler's instructions, I should work with the lawyers defending the Al Sadeq proceedings in relation to the allegations that formed part of Al Sadeq's case about surveillance on Stokoe in Dubai. Amir also sent me an extract of the document which contained these allegations Although I contacted Enyo Law and discussed the matter briefly with Edward Allen, a partner at the firm, nothing further came of it. From what I am aware, at that time Enyo Law represented neither the Ruler nor RAK but did represent Neil and Dechert in the Al Sadeq proceedings. For the avoidance of doubt, I had no involvement in the alleged surveillance of those acting on behalf of Al Sadeq as alleged in the Al Sadeq proceedings, and in particular I did not break into the hotel room of one of Al Sadeq's solicitors in Dubai.

34. Paul Robinson ("**Paul**") was served with proceedings in a claim by Stokoe on 1 July 2020. I have known Paul for a long time and we have a friendly professional relationship. Shortly after he was served, he sent me some of the documents from that claim via Signal, for the reason that I was named in those proceedings. I then sent them on to Neil to inform him of what was happening.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed ……………………………………………

Stuart Robert Page

Dated          7 February 2022

490