IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-MC-20707-JEM/BECERRA

*In re:* Application Pursuant to
28 U.S.C.§ 1782 of

FARHAD AZIMA
5921 Ward Parkway
Kansas City, Missouri 64113,

        *Petitioner,*

v.

INSIGHT ANALYSIS AND RESEARCH, LLC
13727 SW 152 Street, #715
Miami, Florida 33177,

SDC-GADOT, LLC
3200 Collins Avenue, Suite L2
Miami Beach, Florida 33140,

and

AMIT FORLIT
5-A Habarzel Street
Tel Aviv, Israel 6971002 IL,

        *Respondents.*
_____/

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
APPLICATION, AS SUPPLEMENTED, FOR AN ORDER PURSUANT
TO 28 U.S.C. § 1782 TO TAKE DISCOVERY HELD BY AMIT FORLIT**

**I.     INTRODUCTION**

On March 10, 2022, this Court granted Petitioner's initial application at D.E. 1, permitting

discovery from respondents Insight Analysis & Research LLC ("Insight") and SDC-Gadot LLC

("Gadot"), as it relates to a case pending in the High Court of Justice of England and Wales (the

"UK Court") – *Farhad Azima -v- (1) RAKIA (2) David Neil Gerrard (3) Dechert LLP and (4)*

*James Edward Deniston Buchanan* (Claim Number: HC-2016-002798) (hereinafter, the "UK Proceeding"). (**Ex. A**: Order Granting Application (D.E. 5).)  Thus far, each of these entities has failed to comply with duly served subpoenas requesting both documents relevant to the UK Proceeding and testimony by a representative witness under Rule 30(b)(6).

The Petitioner now also seeks, pursuant to 28 U.S.C. § 1782 and Federal Rule of Civ. Proc. 45, discovery from Amit FORLIT, the principal of those respondents, by and through a supplemental application.[1]  Specifically, Petitioner requests that the Court issue an order authorizing issuance of a subpoena to FORLIT in his personal capacity, requiring him to produce documents and submit to a deposition in the Southern District of Florida, where FORLIT is "found."  This memorandum of law is respectfully submitted in furtherance and support of the supplemental application request.[2]

As the Court is aware from the initial application, the UK Proceeding seeks to hold a group of defendants accountable for the unlawful hacking and publication of Petitioner's personal and proprietary electronic data.  (*See* **Ex. B**: Declaration of Attorney Dominic Holden, filed in support of the initial application.[3])  FORLIT was a part of the hacking conspiracy, having worked on

---

[1] The Court held a hearing on June 6, 2022 to address briefing related to Petitioner's issuance of subpoenas to FORLIT in his personal capacity.  (*see* D.E.s 7, 10, 14, 17, and 18).  In D.E. 21, the Court held that Petitioner must resubmit a supplemental application to specifically address that request.

[2] Petitioner incorporates the memorandum of law and supporting declarations filed at D.E. 1 herein.

[3] The Holden declaration references and attaches several exhibits to D.E. 1.  Because the exhibits referenced in the Holden declaration have already been filed with the Court, and are quite voluminous, they are not reattached at Ex. B. Moreover, to the extent that any of the exhibits to the Holden declaration are relevant to this supplemental application, they are referenced herein and attached as separate exhibits hereto.

behalf of the defendants named in the UK Proceeding and receiving payment for his work through Insight and Gadot, both Florida incorporated entities.

Moreover, FORLIT himself has evidence relevant to the UK Proceeding, separate and apart from the information held by the entities.  Indeed, as discussed below, FORLIT has provided two affidavits to this Court that reference the extent of his knowledge regarding Petitioner and the hacking scheme.  Additionally, and important for this Court's consideration, FORLIT has made false statements in those affidavits, in an attempt to circumvent this Court's jurisdiction.  Those false statements are directly contradicted by statements of others and subpoenaed records, such as the bank account records for Gadot, showing that FORLIT personally controlled millions of dollars flowing through Gadot during and after the time of the hacking conspiracy.

Petitioner submits that discovery from FORLIT, in his personal capacity, is necessary and proper at this juncture.  It is clear that FORLIT created and controlled Insight and Gadot, used them to funnel proceeds he earned from the hacking conspiracy, and engaged in conduct relevant to the UK Proceeding.  As explained below, this Court has the jurisdiction to permit discovery of FORLIT in this District because (a) the requirements of Section 1782 are met, including that FORLIT be "found" in Florida; (b) Insight and Gadot, which are active Florida entities, are mere instrumentalities or "alter egos" of FORLIT, so he should appear in Florida, as they would; and (c) Florida's long-arm statute and the Fourteenth Amendment's Due Process clause allows for FORLIT to be brought here for discovery.  Accordingly, AZIMA asks that the Court grant the supplement relief sought.

## II.     BACKGROUND

### A.     Procedural Posture of the UK Proceeding

The dispute in the UK traces back to 2016, when the Ras Al Khaimah Investment Authority ("RAKIA") sued the Petitioner in a civil action in the UK Court over a business dispute.  (Ex. B, ¶¶ 4-5.)  RAKIA is the investment authority of the Emirate of Ras Al Khaimah ("RAK"), which is one of the seven emirates of the United Arab Emirates ("UAE").[4]  (*Id*. at ¶ 4.)  Evidence that allegedly supported RAKIA's claim in the business dispute was illegally obtained from the hacking of Petitioner's computers and e-mail accounts.  (*Id.* at ¶ 5.)  Petitioner filed a counterclaim, asserting that RAKIA and its agents were responsible for illegally obtaining the material by hacking the Petitioner.  (*Id*.)

At an initial trial in January and February 2020, RAKIA argued that they (and now-defendants in the UK Proceeding) fortuitously "found" Petitioner's data in the public domain.  (*Id.* at ¶ 6.)  RAKIA presented the testimony of witnesses who said that a purported journalist, Majdi Halabi, "found" the hacked materials on the internet and provided them to Stuart Page, a private investigator based in the UK.  (*Id.* at ¶¶ 23-26.)  On May 22, 2020, the UK Court entered a judgment for RAKIA and dismissed Petitioner's counterclaim.  (*Id*. at ¶ 6.)  The trial court found that while the testimony about how the data came into the possession of RAKIA was untrue, the Petitioner did not establish or prove that RAKIA was responsible for the hacking of his data. (*Id.* at ¶ 7.)

The appellate court remanded for a new trial in which Petitioner is permitted to pursue discovery and submit new evidence.  (**Ex. C**: UK Sept. 9, 2020 Order.)  In October 2021, Petitioner amended the counterclaim with additional facts discovered and to name additional defendants –

---

[4] Since his father's death in 2010, Sheikh Saud bin Saqr Al Qasimi ("QASIMI") has ruled RAK.

particularly, RAKIA's outside counsel Dechert LLP, Dechert partner Neil Gerrard, RAKIA executive Jaime Buchanan, and Mr. Page.  (Ex. B, ¶ 9.)

On January 28, 2022, Petitioner filed a re-re-amended counterclaim, which is the current, operative version of Petitioner's claim in the UK Proceedings. (**Ex. D**: Re-Re Complaint.)  The re-re-amended counterclaim was based in part on a sworn affidavit of Mr. Page regarding the hacking committed and the cover-up to hide such conduct, as explained below.  (**Ex. E-1**: Jan. 7, 2022 Affidavit of Mr. Page; and **Ex. E-2**: Feb. 7. 2022 Affidavit of Mr. Page.)  Much of this information contradicts statements by RAKIA's witnesses in the first trial, and strongly supports Petitioner's claim in the upcoming re-trial.

### B.     The Hacking Scheme Employed to Hack Petitioner's Data

Mr. Page, founder of the private security and intelligence firm "Page Group," is a well-known British private investigator and security consultant.  His company has handled large-scale international matters for decades on behalf of individuals, entities, and governments.  In January 2015, Mr. Page was retained by QASIMI to investigate Swiss-Lebanese engineer Khater MASSAAD, formerly a close friend and ally to QASIMI and his family.  (Ex. E-1, ¶ 6; Ex. D., ¶¶ 28-30.)   Since at least the early 1990's, MASSAAD assisted RAK in several business developments and dealings.  Mr. Page, in turn, hired a hacker, FORLIT, to gather intelligence. Mr. Page chose FORLIT because FORLIT is "a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service), and his team of analysts had previous experience in military intelligence on behalf of the Israeli Defense Force."  (Ex. E-1, ¶ 9.)  The codename given

for the project, and used between Mr. Page, FORLIT and FORLIT's team was "Project Beech" or "Project Beach." [5]  (*Id.* at ¶ 10.)

As alleged in the UK counterclaim, Petitioner was associated with MASSAAD, but has done work with multiple RAK entities for decades.  (Ex. D, ¶ 15.)  Project Beech/Beach included gathering intelligence on the Petitioner, given his association with MASSAAD.  Starting in the fall of 2015, Petitioner's personal and proprietary data was hacked from his computers and e-mail accounts.  (Ex. B, ¶ 14.)  At the time, Petitioner was unaware that he was the victim of such illegal hacking.  As explained above, part of the data obtained was used by RAKIA to support litigation against Petitioner and Petitioner's company (HeavyLift) regarding a joint venture deal.  RAKIA and its agents remain the only parties who have used Petitioner's hacked data. (Ex. D, ¶¶ 62-65.)

On March 2, 2016, RAKIA and Petitioner signed a settlement agreement in which RAKIA agreed to pay Petitioner $2.6 million to resolve outstanding claims regarding the joint venture. (*Id.*)  On July 16, 2016, counsel for RAKIA, including Neil Gerrard of Dechert LLP, met with Petitioner in London to discuss settlement between RAKIA and MASSAAD.[6]  (*Id.* at ¶¶ 66-67.) At the meeting, Mr. Gerrard told Petitioner that he would be rendered "collateral damage" if RAKIA could not come to an agreement with MASSAAD.  (*Id.*)  On August 4, 2016, links to Petitioner's personal data first appeared on websites.  (Ex. D, ¶¶ 68-71.)  Additional tranches

---

[5] As described in detail in the re-re-amended counterclaim, RAKIA also used other hackers and other hacking supervisors to hack Petitioner and his associates. The roles of the various members of the conspiracy are described in the second amended counterclaim.

[6] In a separate matter, on May 16, 2022, the UK Court found that Dechert and Mr. Gerrard, Dechert's former head of white-collar crime in London, had committed deliberate acts of wrongdoing and had acted dishonestly in their dealings with a long-standing and high worth client, ENRC. Mr. Gerrard was retained by ENRC to conduct an internal investigation into fraud and corruption at the company.  However, the UK Court found that for years thereafter, Mr. Gerrard stretched out the investigation in order to extract maximum fees from the matter, and use the company as a "cash cow."

appeared on August 30, 2016 and September 8, 2016. (Ex. B, ¶ 21.) On January 27, 2017, additional links including Petitioner's stolen data were published on various internet blogs. (Ex. B, ¶ 99.) These links remained active until around May 9, 2019. (*Id.*) On June 3, 2019, the blogs containing links to Petitioner's stolen data were modified to include new links from WeTransfer. These links are still available on the internet. (*Id.*)

FORLIT used various methods to conduct intelligence for the project, including the capture of electronic data and communications via hacking of computer systems. FORLIT would prepare reports of his work and update Mr. Page, Mr. Gerrard, Mr. Buchanan, and QASIMI monthly. (Ex. E-1, ¶¶ 11-12.) FORLIT's work and involvement in the hacking conspiracy and subsequent cover-up spanned the time period of February 2015 to May 2020. (*Id.* at ¶ 15.) During this time, RAK entities compensated Mr. Page at an average fee of $300,000 (USD) per month. (*Id.* at ¶ 17.) Given the extent of FORLIT's work, Mr. Page paid FORLIT, on average, $250,000 (USD) per month. (*Id.*) Mr. Page has advised that he received invoices from FORLIT during this time, instructing payment for FORLIT's work on the project to be made to Insight and Gadot, for Project Beech/Beach. (**Ex. F**: Invoices to Mr. Page for FORLIT's work.) Mr. Page understood that Insight, a Florida entity, was the company owned and used by FORLIT to conduct his illicit hacking work and through which he funneled monetary proceeds from said work. (Ex. E-1, ¶¶ 13-14, 17.)

### C.    The Cover-Up of the Hacking Scheme

Sometime in 2017, FORLIT requested that Mr. Halabi falsely state that Mr. Halabi had discovered the links to Petitioner's personal and proprietary data on the internet's dark web. (**Ex. G**: Affidavit of Mr. Halabi.) FORLIT has since admitted in an affidavit in this proceeding that he in fact provided links to Petitioner's hacked data to Mr. Page. (**Ex. H:** FORLIT's affidavits.) On

September 21, 2018, Petitioner amended his defense in the UK Proceeding to include a cross-claim and defense of hacking. (*See* Ex. D, generally.)

According to Mr. Halabi, on October 25, 2018, he met with Mr. Gerrard, FORLIT, Mr. Page and others in Cyprus to develop the false story about how RAKIA obtained Petitioner's hacked data. (Ex. E-1, ¶¶ 36-39; *see also* Ex. G, ¶¶ 12-15.)  On November 6, 2018, RAKIA responded to Petitioner's request for information in the UK Proceeding, and deployed the false narrative the group had concocted.  On November 21, 2018, Mr. Gerrard, FORLIT, Mr. Halabi, Mr. Page, and others met again in Cyprus to further discuss this narrative, and on December 11, 2018, RAKIA responded to additional requests for information in the UK Proceeding. (*Id.*) This time, RAKIA's response specifically mentioned Mr. Halabi's alleged "discovery" of the stolen information on the web.

To ensure their stories were aligned, Mr. Halabi met in-person with Mr. Gerrard, FORLIT, Mr. Page and others multiple times in May 2019.  (Ex. G, ¶¶ 18-23.)  In preparation for trial in the UK Proceeding, on December 1-3, 2019, Mr. Page and Mr. Halabi met with Mr. Gerrard and FORLIT at the Moosegg hotel outside of Bern Switzerland to rehearse the false trial testimony. (Ex. E-1, ¶¶ 46-53; *see also* Ex. G, ¶¶ 24-30.)

The UK trial occurred between January 22, 2020 and February 14, 2020.  (Ex. B, ¶ 6.) RAKIA called several witnesses, including Mr. Gerrard, Mr. Page, Mr. Halabi and others to testify. Each witness provided false testimony regarding how RAKIA came into possession of Petitioner's data, in line with the false story they developed with FORLIT and others, through months of secretive meetings in Cyprus, Switzerland, and London.  (*See generally* Ex. B, ¶ 26; Ex. E-1, ¶ 5; Ex. G, ¶32.)

In February 2020, Mr. Page was instructed to investigate Petitioner's source of funding for the litigation.  (Ex. E-2, ¶¶ 25-27.) Once again, Mr. Page hired FORLIT to conduct the work. FORLIT prepared reports of his intelligence gathering and sent them to Mr. Page, who in turn provided them to Mr. Gerrard and others.

### D.      FORLIT's Ties to Insight and Gadot

Insight and Gadot are Florida-based entities formed by FORLIT on October 18, 2017. (**Exs. I and J**: Incorporation Record and Annual Reports for Insight and Gadot, respectively.) Insight and Gadot are active Florida corporations, having filed annual reports with the Florida Department of State, Division of Corporations, consistently each year between 2018 to 2022.  The street and mailing address for Insight is 13727 SW 152 Street, Unit 715, Miami, Florida 33177. (Ex. I, at p. 1.)  The registered agent is SRSL Management, Inc., at 4101 Pine Tree Drive in Miami Beach, Florida.  (*Id*.)  The street and mailing address for Gadot at the time of incorporation was the same address as Insight's, but a different unit (Unit 649).  (Ex. J, at p. 1.) In 2018, Gadot's street and mailing address was changed to 210 West 89th Street, Apt. 1K, in New York City.  (*Id*. at p. 3.)  The registered agent for Gadot continues, however, to be the same as Insight's.

FORLIT is tied to both Insight and Gadot and appears as the only founder, managing member, and employee for the entities. With respect to Insight, Insight's incorporator and managing member is listed as Alon Omri GURLAVIE, at 5 Habarzel Street in Tel Aviv, Israel. (Ex. I., at p. 2.)   Several documents, however, establish that GURLAVIE *is* FORLIT. Comprehensive reports from Accurint and TLO for FORLIT reveal that in the United States, his residential address is the same as Insight's street and mailing address: 13727 SW 152 Street, Unit 715, Miami, Florida 33177.  (**Ex. K**: Accurint and TLO redacted reports for FORLIT.)

Moreover, FORLIT was assigned a social security number in or around 1990, ending in 9459.  The same exact social security number is used by GURLAVIE, who also shares FORLIT's date of birth. (*Id*. at p. 2.)  Lastly, in correspondence with the registered agent for Insight and Gadot, Shimon Goldberger of SRSL Management, regarding subpoenas issued pursuant to D.E. 5, Mr. Goldberger stated that he would provide the subpoenas for both companies to FORLIT and accountant Ari Propis (Mr. Goldberger did not mention GURLAVIE).

In addition, when FORLIT responded to Mr. Golberger, Mr. Goldberger noted that the email address he had for FORLIT (the Gadot email address) seemed not to work, but that the "omri48@gmail.com" prompted a response from FORLIT.  Moreover, FORLIT's response to Mr. Goldberger was signed "Amit," but the signature block was for GURLAVIE:

| From: | Shimon |
|---|---|
| To: | Herbert, Ian |
| Cc: | Lee, Calvin |
| Subject: | Re: Insight Analysis and Research LLC and SDC-Gadot LLC |
| Date: | Friday, April 29, 2022 3:17:33 PM |

**EXTERNAL**

See the below email that I received early this morning.
As I had mentioned in one of my previous emails my original emails did not go through. I had a bad email address for Mr Forlit.
(Actually the one I had is the amit@gadot.co but it kept coming back undeliverable. When I sent it to omri48@gmail.com it seems that it when through as he had responded)

**From:** Amit Forlit <amit@gadot.co>
**Date:** April 29, 2022 at 5:37:36 AM EDT
**To:** shimon@srslmanagement.com
**Cc:** omri gur-lavie <omri48@gmail.com>, אילן עו"ד מפלורידה <Elan@baretlawgroup.com>
**Subject: Fwd: Insight Analysis and Research LLC and SDC-Gadot LLC**

Hey Shimon
I really don't know you....
But I totally understand what you saying about drag in to this without any link to me or the company

I just got on the first time your email from last Wednesday so until i got it I didn't handle the legal issue

The next day I spoke with an attorney and from next week he will handle all of those meters

Even that I never "haired" you let me thank you for your efforts

BR
Amit

התחל הודעה מועברת:

**מאת:** omri gur-lavie

נשלח מה-iPhone שלי

התחל הודעה מועברת:

Moreover, the address listed for GURLAVIE on Insight's annual reports is the same address where FORLIT claims to be currently residing: 5 Habarzel Street in Tel Aviv, Israel. Based on these documents and information, it is logical and reasonable to conclude that FORLIT (*a/k/a* GURLAVIE) incorporated, controls, and manages Insight.

FORLIT's ties to Gadot are clearer and even more pronounced. FORLIT incorporated Gadot and is listed as its managing member. He signed the annual reports each year, most recently on January 27, 2022. Moreover, FORLIT submitted two affidavits in this case, in relation to his motion to quash the previously served subpoena for documents and his deposition testimony. In

both affidavits, FORLIT acknowledges that he is the sole managing member of Gadot and that Gadot has no other employees.  FORLIT also uses an email address with the domain "gadot.co," as is evidenced by the above email, proving further that FORLIT controls Gadot, which has refused to appear for a deposition and failed to produce documents.

### E.    Insight's and Gadot's Ties to the Hacking Scheme

With respect to Insight, Gadot and FORLIT's respective roles in the hacking scheme, according to Mr. Page, Insight was FORLIT's company and Mr. Page understood that Insight was conducting the work for the RAK and RAKIA.  Mr. Page specifically stated as follows: "I understood from Amit that Insight made use of subcontractors located outside of Israel which employed all the above means of intelligence gathering, including SIGINT and the use of hacking techniques for this purpose."  (Ex. E, at ¶ 9.)  On a monthly basis, Insight and Gadot submitted invoices to Mr. Page and the Page Group, for payment to Insight and/or Gadot for FORLIT's work on Project Beech/Beach.  (Ex. F.)

In addition, financial records obtained support Mr. Page's statements.  (**Ex. L**: Gadot's Citibank Account Records.) The Petitioner has received financial records from Citibank for Gadot's bank account.[7]  Contrary to FORLIT's claim that Gadot never conducted business or operations, Gadot's bank records show substantial business activity (that is, millions of dollars) through 2021, including activity with other Florida entities, such as:

- Between March 2018 and June 2018, SDC-Gadot received $600,000 from Florida IP Telecom Inc.  (Ex. L, at pp. 2, 6.)  According to the state's public records, Florida IP Telecom Inc. was a Florida company with an address at 20200 W. Dixie Highway, Suite 1204, Miami, Florida 33180.

- Between March 2018 and June 2018, SDC-Gadot received $2.1 million from Overseas Consulting LLP.  (*Id.* at p. 4.)  According to its website, Overseas Consulting LLP is a

---

[7] The Petitioner is awaiting receipt of additional records from other financial institutions regarding Insight's and Gadot's bank accounts.

company with the same address as Florida IP Telecom: 20200 W. Dixie Highway, Suite 1204, Miami, Florida 33180.

• In September 2019, Mario Ros, a Citibank personal banker at the 2001 Biscayne Blvd. branch in Miami, emailed FORLIT regarding the SDC-Gadot account, indicated that FORLIT operated as owner and signatory of the account. (*Id.* at p. 1.)

• The bank records list the address for SDC-Gadot as 13727 SW 152 Street, Suite 649, Miami, Florida 33177. (*Id*. at p. 3.) The bank records do not list a New York or Israeli mailing address.

• The Citibank account records show a payment of $31,000 from Global Impact Services LLC as recently as May 10, 2021. (*Id.* at p. 21.)

The Citibank records demonstrate that wires from Gadot were directed by FORLIT. As just one example, in March 2018, Gadot send $30,000 to Aviram Hawk-Consultant, a company run by Aviram Azari, who has pled guilty to hacking in the Southern District of New York. (*Id.* at p. 3.) The wire transfer records show that the wire from Gadot's account was approved by FLORIDA and the address associated with the account was in Florida:



In addition, Gadot received monies from the Page Group and others for "overseas consulting" work. Indeed, in late May 2018, while the ongoing conspiracy and cover-up of the hacking scheme was occurring, $537,450 was sent to Gadot for such alleged "consulting" work. (*See id*. at p. 4.) Based on the foregoing facts, Petitioner submits that such "consulting" work is actually FORLIT's hacking efforts and role in the cover-up.

**F.     The Discovery Requested**

Given the sworn allegations and pleadings in the UK Proceeding, it is clear that Insight and Gadot are in possession of relevant evidence related to the hacking scheme. Indeed, on March 10, 2022, this Court granted Petitioner's application to take discovery from Insight and Gadot pursuant

to 28 U.S.C. § 1782.  (D.E. 5.)  The companies have defaulted on subpoenas issued for documents and have failed to produce a Rule 30(b)(6) witness at scheduled depositions.  The Court granted Petitioner's motion to compel, and the production of documents and appearance of a Rule 30(b)(6) witness is now scheduled for June 15, 2022.  (D.E. 21.)

In addition to seeking discovery from Insight and Gadot, Petitioner submits that discovery from FORLIT, in his personal capacity, is relevant, within this Court's jurisdiction and reach, and should be ordered by the granting of this supplemental application.  Given the facts alleged above, Petitioner argues that FORLIT has pertinent information about the hacking scheme and the parties involved in the UK Proceeding, perhaps even beyond information held by Insight and Gadot. Moreover, FORLIT has submitted himself to the jurisdiction of this Court because he serves as the alter ego of Insight and Gadot, companies he strategically formed in Florida to facilitate the hacking scheme; and whose business operations and dealings took place in Miami.

Draft subpoenas seeking documents and testimony from FORLIT are attached hereto at **Ex. M**.  The materials sought are narrow and tailored to items related to acts and/or transactions in the Southern District of Florida, pertaining to the hacking scheme.  For instance, Petitioner seeks documents and communications related to the work FORLIT performed for RAK, RAKIA, Page Group and/or Mr. Page, for which he was paid by and through Insight and Gadot from 2017 to date, including monthly reports, invoices, payment records, and any and all documents regarding meetings between FORLIT and the named parties to the UK Proceeding.

III.    **ARGUMENT**

    A.    **The Statutory Requirements of Title 28, United States Code, Section 1782 Are Met.**

This Court has the authority to grant Petitioner's application pursuant to Title 28, United States Code, Section 1782 for assistance in obtaining evidence for use in connection with the UK

Proceeding.  Section 1782 provides, in pertinent part, that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."  28 U.S.C. § 1782(a); *see also Intel Corp. v. Adv. Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).

The Eleventh Circuit has held that the requirements of Section 1782 are met when the following are shown: "(1) the request must be made 'by a foreign or international tribunal,' or by 'any interested person'; (2) the request must seek evidence, whether it be the 'testimony or statement' of a person or the production of 'a document or other thing'; (3) the evidence must be 'for use in a proceeding in a foreign or international tribunal'; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance."  *Victoria, LLC v. Likhtenfeld*, 791 F. App'x 810, 816 (11th Cir. 2019) (cited by *In re England/Bahamas*, No. 20-MC-61696, 2021 WL 3270074, at *2 (S.D. Fla. July 30, 2021)).  Petitioner's supplemental application seeking discovery from FORLIT meets all four requirements.

*First*, Petitioner is an "interested person" in the underlying foreign or international proceeding.  Litigants in a case being adjudicated before a foreign tribunal are "interested persons" for purposes of Section 1782.  The Supreme Court has held that "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."  *Intel Corp.*, 542 U.S. at 256.  Accordingly, Petitioner is an "interested person" within the meaning of Section 1782.

*Second*, Petitioner seeks to compel testimony and the production of documents from FORLIT, to use in furtherance of the UK Proceeding.  The nature of Petitioner's requests clearly meet the second statutory requirement that the request be for "evidence."

15

*Third*, the discovery is sought for use in connection with a proceeding before a foreign or international tribunal.  The UK Court is clearly a foreign tribunal within the meaning of Section 1782.  *See Intel Corp.*, 542 U.S. at 257-58.

 *Fourth*, FORLIT is "found" in this district both because of his substantial connections to the jurisdiction and by virtue of his formation and use of the Insight and Gadot entities as his "alter ego" to engage in the conduct set out above.

### 1.    FORLIT has substantial contacts in Florida.

FORLIT engaged in systemic contacts in the Southern District of Florida. He formed Insight and Gadot as Florida LLCs to engage in business in Florida – and bank accounts belonging to Insight and Gadot received funds from Mr. Page for FORLIT's hacking work.  As such, FORLIT has received pecuniary gain from the operation of Insight and Gadot, directly related to the UK Proceeding.  Moreover, FORLIT has strong ties and connections with Florida.  As explained above, the activities conducted in Florida, by and through Insight and Gadot but on behalf of and for FORLIT's benefit, are substantial and not isolated.

Moreover, there is indication that FORLIT spent significant time in the United States, including a trip to Florida in April 2020.  Indeed, Gadot's bank records show that the debit card for the account was used in Miami between April 3, 2020 and April 6, 2020.  In addition, the records show the debit card was used to purchase a $40,000 Porsche in June 2019. Since FORLIT's own affidavits submit that he is the sole authorized member of SDC-Gadot and that SDC-Gadot "has no employees," these debit card purchases were presumably all made by FORLIT.

### 2.    FORLIT is the "alter ego" of Insight and Gadot.

Because FORLIT is the "alter ego" of Insight and Gadot, he must appear in Florida for discovery, just as the entities are required to.  To pierce the corporate veil, a plaintiff must establish

that (1) the defendant "dominated and controlled the corporation to such an extent that the corporation lacked independent existence and the defendant was in fact an 'alter ego' of the corporation," (2) the defendant "engaged in 'improper conduct' in the formation or use of the corporation," and (3) the "improper formation or use of the corporate form injured the plaintiff." *East Okeechobee Palms, LLC v. Kellam*, 2015 WL 12977392, at *4 (S.D. Fla. 2015); *see also Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1117 (Fla. 1984) (The overwhelming weight of authority is to the effect that courts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose); *Stonepeak Partners, LP v. Tall Tower Capital LLC*, 231 So. 3d 548, 556 (Fla. 2d DCA 2017) ("To pierce the corporate veil the plaintiff must establish [] the corporation is a mere instrumentality or alter ego of the defendant.").

First, neither Insight nor Gadot has presented a Rule 30(b)(6) witness to testify at a deposition or has produced any documents in response to the subpoenas issued. FORLIT's own admissions in his two affidavits submitted in this cause establishes why: Gadot (and presumably Insight) has no other employees besides FORLIT. He not only formed the corporation, but he is the sole managing member and employee. The corporations appear to lack independence and are solely used as FORLIT's pawns. Indeed, though the companies have yet to produce documents, they do not appear to recognize any corporate formalities or person separate and apart from FORLIT. As demonstrated above, FORLIT uses a Gadot email address and also seems to receive emails directed to GURLAVIE, the authorized agent for Insight. The physical addresses associated with the companies are also associated with FORLIT personally. Since FORLIT claims that his company has no employees, the debit card usage associated with the Gadot's bank account must reflect FORLIT's personal spending, including salon services in Miami, the purchase of a

Porsche, and the purchase of tickets to shows in Las Vegas. These spending patterns appear to be for personal – not corporate – benefit.

Second, FORLIT's use of Insight and Gadot to receive monies from his hacking work establish that he engaged in improper conduct in the use of the corporations. One cannot use a corporation for money laundering in this manner and expect to be shielded from the Court's reach.

Last, the improper use of Insight and Gadot has harmed the Petitioner. Petitioner's personal and proprietary information was hacked and used by the members of the hacking conspiracy, including FORLIT, who was paid handsomely for his work by Mr. Page through Insight and Gadot. For these reasons, Petitioner submits that FORLIT operates as the alter ego of Insight and Gadot and this Court properly has personal jurisdiction over him.

**B.      This Court also has personal jurisdiction over FORLIT under Florida's "long-arm" statute and the Due Process clause of the Fourteenth Amendment.**

This Court also has personal jurisdiction over FORLIT under Florida's long-arm statute. A federal court sitting in Florida must conduct a two-step inquiry to determine whether it has personal jurisdiction over a non-resident defendant and ask two questions as part of that inquiry: (1) whether personal jurisdiction exists over the nonresident defendant under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *See Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d, 1231, 1237 (S.D. Fla. 2015) (internal citations omitted); *XL Vision, LLC v. Holloway*, 856 So. 2d 1063 (Fla. 5th DCA 2003); *ripKurrent, LLC v. Ballard IRA, LLC*, 530 F. Supp. 3d 1281 (S.D. Fla. 2021). Initially, a plaintiff seeking to establish jurisdiction over a non-resident defendant need only allege sufficient material facts to make out a prima facie case of jurisdiction. *ripKurrent*, 530 F. Supp. 3d at 1238.

Under the *first prong* of the analysis, federal courts must construe the Florida long-arm statute, codified at Florida Statute Section 48.193.   Under Section 48.193(1)(a)1, "a person, whether or not a citizen or resident of this state, who personally or through an agent" operates, conducts, engages in, or carries on a business or business venture in Florida, or having an office or agency in Florida, "thereby submits himself … to the courts of this state for any cause of action arising from" the operation  and engagement of business in Florida.

FORLIT regularly conduct business in Florida, through Insight and Gadot.  As Mr. Page said in his sworn affidavit, and evidenced by the invoices at Ex. F, Mr. Page paid FORLIT for FORLIT's hacking services through these entities' bank accounts.  It is clear that Insight and Gadot, given their incorporation and active business status in Florida, are "at home" and found in the District.  This Court has held as much by and through its March 10, 2022 Order (D.E. 5) and June 8, 2022 Order (D.E. 21).

Under the *second prong* of the analysis, the Court must determine whether FORLIT has had sufficient "minimum contacts" with Florida and whether the exercise of jurisdiction over FORLIT would offend the "traditional notions of fair play and substantial justice." *See ripKurrent*, 530 F. Supp. 3d at 1292.  FORLIT has significant contacts with the Southern District of Florida, as described above, and exercise of jurisdiction over FORLIT cannot offend notions of fair play and substantial justice here where FORLIT specifically sought Florida out as the place of incorporation for Insight and Gadot and chose to actively funnel money from his business dealings through these entities.  Such contact with Florida is not random or attenuated – it was done by design and with clear intent.

Moreover, FORLIT's actions that harmed Petitioner, as alleged in the UK counterclaim, were undertaken through this District.  As discussed above, Mr. Page's testimony and invoices,

which are corroborated by Gadot's bank records, make clear that Mr. Page paid FORLIT for his role in the hacking conspiracy and cover-up through FORLIT's Florida entities. As such, under Florida's long-arm statute, he is subject to personal jurisdiction in this District.

### C.    The *Intel* Discretionary Factors Also Weigh in Favor of Granting this Supplemental Application.

In *Intel Corp. v. Adv. Micro Devices, Inc.*, the Supreme Court identified four discretionary factors that guide district courts in considering the grant of a Section 1782 discovery application: (1) whether the respondent is a participant in the international tribunal proceedings, (2) whether the foreign tribunal is resistant to section 1782 discovery, (3) whether the petitioner is concealing an attempt to circumvent tribunal proof-gathering restrictions, and (4) whether the requested discovery is relevant and narrowly tailored. Each of the discretionary factors weigh in favor of granting this supplemental application. 542 U.S. at 264-66.

### 1.    Respondent is Not a Participant in the UK Proceeding

First, *Intel* held that district courts should consider whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Id.* at 264.  This is because "the need for § 1782(a) aid [against a participant] generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id.*

FORLIT is not a participant in the UK Proceeding.   Thus, the evidence held by FORLIT is outside the jurisdictional reach of the UK Court.  Indeed, Section 1782 was enacted specifically to assist parties in litigation facing this type of situation.  "A foreign tribunal has jurisdiction over those appearing before it. . . .In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; thus, their evidence, available in the United States, may be unobtainable absent [Section] 1782(a) aid." *Intel Corp.*, 542 U.S. at 244.  For that reason, the

fact that the person from which discovery is sought is a "nonparticipant" in the foreign or international proceedings typically weighs in favor of granting the requested discovery. *Id*. at 264.

### 2.      The UK Court is Receptive to Section 1782 Discovery

Second, *Intel* held that a district court should consider the "receptivity" of the foreign or international tribunal in question to "U.S. federal-court judicial assistance." *Intel Corp.,* 542 U.S. at 264.  This does not require the district court to engage in an extensive analysis of whether a foreign or international tribunal would be receptive to discovery assistance.  Rather, the inquiry requires courts to "contemplate[] the climate of the foreign court and proceedings to ascertain how receptive it will be to the sought discovery." *Victoria, LLC v. Likhtenfeld*, 791 F. App'x 810, 817 (11th Cir. 2019) (cited by *In re England/Bahamas*, No. 20-MC-61696, 2021 WL 3270074, at *2 (S.D. Fla. July 30, 2021)).  In so doing, courts consider "the nature of the foreign tribunal" and "the character of the proceedings." *In re Clerici*, 481 F.3d 1324, 1335 (11th Cir. 2007).  After conducting this analysis, the Southern District of Florida has granted applications pursuant to Section 1782 for matters pending in the UK.  *See In re England/Bahamas*, 2021 WL 3270074, at *2; *In re Novoship (UK) Limited*, No. 20-60876, 2020 WL 3286308, at *3 (S.D. Fla. June 18, 2020).

The nature and character of the UK Proceeding is such that the court will be receptive to foreign discovery.  The documents, materials, and information sought from FORLIT concerns potential evidence that supports Petitioner's claims of misconduct perpetrated by the counterclaim defendants.  Given their relevance to the proceedings, Petitioner has good reason to believe that the requested documents and deposition testimony could, and would, be considered by the UK court.  There is no reason to think that the discovery sought would be inadmissible or otherwise rejected by the UK court.

### 3. Petitioner Is Not Concealing an Attempt to Circumvent Any UK Court Proof-Gathering Restrictions

Third, *Intel* held that a district court should consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel,* 542 U.S. at 265. This factor is intended to protect against an applicant's misuse of the process by verifying that it is not attempting to avoid proof-gathering restrictions that are imposed in the underlying proceeding. However, the law is clear that, absent bad faith on the part of the applicant, a court will not weigh this factor against allowing discovery. Courts will not withhold discovery if nothing in the record suggest that the application conceals an attempt to circumvent foreign proof gathering. Courts have held that the fact that the requested information would not be discoverable in the foreign proceeding is insufficient to demonstrate that a Section 1782 application is an attempt to circumvent restrictions. *See In re England/Bahamas*, 2021 WL 3270074, at *6 (holding that there is no attempt to circumvent UK proof gathering restrictions when the court "is unaware of any authority to support the conclusion that either jurisdiction would prohibit parties from obtaining and using deposition testimony obtained elsewhere").

Petitioner's application does not seek to avoid any proof-gathering requirements of the UK Court and is a good-faith attempt to seek discovery that would assist him in presenting his case at the UK Court, namely by obtaining additional evidence regarding the hacking perpetrated by the UK Defendants and subsequent cover-up. The fact that the UK Court has no jurisdiction over FORLIT makes it necessary for Petitioner to pursue discovery from FORLIT through this Court. Petitioner is pursuing this discovery at the first available opportunity because in the first trial, RAKIA did not disclose Insight, Gadot, or FORLIT's involvement in the investigation of Petitioner or in the scheme to defraud the UK Court.

### 4.   The Discovery Sought is Relevant and Narrowly Tailored

Lastly, *Intel* held that a district court should consider whether "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel Corp.*, 542 U.S. at 265.  In reviewing this factor, courts look to whether the request is sufficiently tailored to the litigation issues for which production is sought.   The Eleventh Circuit instructs district courts to examine whether an application contains "unduly intrusive or burdensome requests," is "made in bad faith or for the purpose of harassment," or is part of a "fishing expedition."   *In re Kivisto*, 521 F. App'x 886, 888 (11th Cir. 2013).

Here, Petitioner's request is narrowly tailored and not unduly burdensome or intrusive. Petitioner has confined his request solely to documents related to two categories: (1) all documents and communications from February 2015 to March 2020 related to any work performed by FORLIT, Insight, Gadot or Mr. Page for RAKIA and/or its agents related directly or indirectly to Petitioner; and (2) all documents and communications from January 2018 to March 2020 related to the UK Proceeding and the conspiracy to lie to the UK court about the discovery of the hacked data.  This limited discovery is not overly broad or unduly burdensome.  The monthly reports prepared by FORLIT and the subsequent cover up of the hacking are key issues in the Amended Counterclaim and will be issues at trial.  The requests are narrowly tailored to address those two narrow issues.

In sum, Petitioner's Section 1782 application satisfies both the relevant statutory requirements and the discretionary factors that have been identified by the Supreme Court in *Intel*. Petitioner's application accordingly should be granted.

## IV.    CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Court grant his Section 1782 discovery application, as supplemented, and enter the accompanying proposed order, authorizing, in addition to the discovery already issued to respondents Insight and Gadot, the issuance of a subpoena to respondent FORLIT to produce the documents requested and appear for his deposition in the Southern District of Florida.

Respectfully submitted,

Dated: June 10, 2022

s/ *Vanessa Singh Johannes*
Michael S. Pasano (FBN 475947)
Email: MPasano@carltonfields.com
Vanessa Singh Johannes (FBN 1028744)
E-mail: VJohannes@carltonfields.com
CARLTON FIELDS P.A.
700 N.W. 1st Avenue, Suite 1200
Miami, Florida 33136-4118
Telephone: (305) 530-0050

s/ *Ian Herbert*
Kirby D. Behre (admitted *pro hac vice*)
Timothy P. O'Toole (admitted *pro hac vice*)
Ian A. Herbert (admitted *pro hac vice*)
Calvin Lee (admitted *pro hac vice*)
MILLER & CHEVALIER CHARTERED
900 16th Street, NW
Washington, D.C. 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
Email: kbehre@milchev.com

*Counsel for Petitioner*

24

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2022, a true and correct copy of the foregoing document was filed via CM/ECF and served on counsel for Mr. Forlit, Christopher S. Salivar and Elan I. Baret, via such means.  In addition, service was made, via the following e-mail address, to the representative agent for the Respondents:

INSIGHT ANALYSIS AND RESEARCH LLC
13727 SW 152 Street #715
Miami, Florida 33177
c/o Shimon Goldberg
Manager's Office
3200 Collins Ave.
Miami Beach, FL 33140
shimon@srslmanagement.com

SDC-GADOT LLC
3200 Collins Ave., Suite L2
Miami Beach, Florida 33140
c/o Shimon Goldberg
Manager's Office
3200 Collins Ave.
Miami Beach, FL 33140
shimon@srslmanagement.com

_s/ Vanessa Singh Johannes_
Vanessa S. Johannes

129882898.1